**Vera CROCHET, on behalf of themselves and others similarly situated; Mary Alice Brown, on behalf of themselves and others similarly situated; Annette Reddick, on behalf of themselves and others similarly situated; Michelle Russ, on behalf of themselves and others similarly situated; Lula Williams, on behalf of themselves and others similarly situated, Plaintiffs–Appellants,**

**v.**

**HOUSING AUTHORITY OF the CITY OF TAMPA, a public body corporate; Audley Evans, in his official capacity as Executive Director of the Housing Authority of the City of Tampa, Defendants–Appellees.**

No. 93–2983.

United States Court of Appeals, Eleventh Circuit.

Nov. 4, 1994.

---

1. Page 605 of majority opinion.

Eugenia Lee Williamson, Bay Area Legal Services, Inc., Robert Joel Shapiro, State's Asst. Atty., Tampa, FL, for appellants.

Ricardo L. Gilmore, Morrison, Gilmore & Clark, Tampa, FL, for appellees.

Before EDMONDSON and COX, Circuit Judges, and JOHNSON, Senior Circuit Judge.

PER CURIAM:

## I. *Background and Procedural History*

The Housing Authority of the City of Tampa ("THA") is a public housing authority (a "PHA") which owns and operates federally subsidized public housing projects in Tampa, Florida. Vera Crochet, Mary Alice Brown, Annette Reddick, Michelle Russ, and Lula Williams (the "Tenants") are tenants living in THA properties. Tampa Electric Company ("TECO"), which is not a party, is an electric utility supplier in the Tampa area.

At the present time, THA employs two methods for handling its tenants' utilities consumption. In approximately 18% of its housing units, THA uses what is called "retail service."[1] Under retail service, THA tenants purchase their electrical power directly from TECO. *See* 24 C.F.R. § 965.402(h) (1993). Thus, the tenants in these housing units maintain separate, individual accounts as customers of TECO and are individually responsible for paying their monthly TECO bill.

THA then provides these tenants with a utilities reimbursement, a fixed dollar amount representing "reasonable" electrical consumption. Normally, the utilities allowance is reflected in a rent reduction to the tenant, although in cases where rents are extremely low, THA will issue a check to tenants to cover the difference between the utilities allowance and the rent payment. If a tenant consumes more electricity than contemplated by the utilities allowance and has a TECO bill higher than the allowance, the tenant is not reimbursed for the excess. Thus, the excess comes out of the tenant's pocket, not THA's.

In its remaining housing units, THA uses what is called a "checkmeter" system. Under the checkmeter system, TECO supplies electricity to a THA housing project through a "central meter." THA then supplies the power to each unit in the project. Under this system, THA is TECO's only customer; the tenants are not TECO customers. THA's electric bill is based on the monthly readings taken from the project's central meter.

THA, in turn, measures each individual unit's electrical consumption using devices called checkmeters. *See* 24 C.F.R. § 965.402(b) (1993). THA provides the monthly utility allowance for electricity by computing the "reasonable" usage level and not charging the tenants if their usage is equal to or

---

[1] Because TECO's deposit and arrearage policies are the principal ones at issue in this case, for simplicity and clarity we refer only to TECO. The Tenants' complaint also addresses the conversion of natural gas utilities, but the analysis remains the same for both conversions.

below that level; a "reasonable" usage level is included in each unit's rent for the month. If a unit uses more electricity than permitted by the utility allowance, THA imposes a surcharge on the tenant for the excess power used. Thus, the excess again is ultimately paid out of the tenant's pocket, not THA's.

The tenants who are plaintiffs in this case reside in units where THA uses the checkmeter system. In June 1991, THA informed the plaintiffs and other residents living in THA's publicly-owned conventional housing developments that it planned to convert their units from checkmetering to retail service. THA's initial letter stated that the residents would be required to pay a deposit and connection fee to initiate service with the utility companies. A second letter stated that TECO would require any resident who had an arrearage from previous electrical service at a non-THA residence to make arrangements to pay the arrearage.

In May 1993, THA notified the residents of Ponce deLeon Courts that they were to make arrangements to pay their deposits and arrearages before July 1, 1993 so that utility service would not be discontinued. The letter threatened that if electric or gas service were cut off, the residents could face eviction. In late July 1993, THA delivered a "Notice of Adverse Action" to tenants in Ponce deLeon Courts who had not paid their utility deposits. The notice stated that the tenants' failure to pay their utility deposits violated their leases, and if arrangements had not been made within seven days of the notice, their leases would be canceled.

Counsel for the Tenants then sent THA's lawyers a letter objecting to the Notice of Adverse Action. In response to the letter, THA rescinded the Notice. The Tenants subsequently filed suit in the district court. They request declaratory and injunctive relief and damages under 42 U.S.C. § 1983 (1988), on behalf of a class composed of "all tenants of THA who are subject to THA's conversion from an individual checkmeter system to retail electrical and gas metering and who have been in the past, are now being, or will be in the future, required to pay to a utility company a utility deposit and

any arrearage allegedly owed as a condition of continued tenancy at THA." (R.1–1 ¶ 7.)

The Tenants' complaint alleges that THA's actions violate their rights under: (1) the United States Housing Act of 1937, 42 U.S.C. §§ 1437 to 1437aaa–8 (1988 & Supp. IV 1992), and regulations promulgated thereunder; (2) the Brooke Amendment to the United States Housing Act of 1937, 42 U.S.C. § 1437a (1988 & Supp. IV 1992); (3) the Due Process Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1; and (4) the laws of the State of Florida. Along with the complaint, the Plaintiffs also filed motions for a temporary restraining order and a preliminary injunction to prevent THA from implementing the conversion to retail metering. After a hearing, the district court denied the Tenants' Motion for Preliminary Injunction, concluding that the Tenants had not demonstrated that they were substantially likely to succeed on the merits of their claims; it then denied the Motion for Temporary Restraining Order as moot. (R.1–26.) The Tenants now appeal pursuant to 28 U.S.C. § 1292(a)(1) (1988) the denial of their Motion for Preliminary Injunction.

## II.   *Standard of Review*

■■■ A substantial likelihood of success on the merits is one of the conditions the Tenants must satisfy in order to justify a preliminary injunction. *See United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983). A preliminary injunction is a "drastic" remedy, and we will disturb the denial of a preliminary injunction only if the district court abused its discretion. *Cafe 207, Inc. v. St. Johns County*, 989 F.2d 1136, 1137 (11th Cir.1993).

## III.   *Discussion*

### A.   *United States Housing Act of 1937*

■ The purpose of the United States Housing Act of 1937 ("the Act") is

to promote the general welfare of the Nation by employing its funds and credit, as provided in this chapter [42 U.S.C. §§ 1404a–1440], to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing

conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income and, consistent with the objectives of this chapter, to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs.

42 U.S.C. § 1437 (Supp. IV 1992). The Tenants argue that THA's conversion from checkmetering to retail service will frustrate the purpose of the Act by imposing additional criteria for continued tenancy not authorized by the Act.

In response to the energy crisis of the 1970s and in order to promote energy conservation, the Department of Housing and Urban Development ("HUD") promulgated regulations "requiring that, to the extent practicable, all Utilities consumed directly by tenants shall be individually metered." 24 C.F.R. § 965.401 (1993); *see* 24 C.F.R. §§ 965.401–.410 (1993) (Individual Metering of Utilities for Existing PHA–Owned Projects). Prior to these regulations, many PHAs operated on a "mastermeter" system, where the PHA did not keep track of individual utility consumption, but simply paid one bill for all utilities supplied to a building or project through a system meter or meters. *See* 24 C.F.R. § 965.402(d). All PHAs using mastermetering were required to convert to individual metering if the conversion was financially justified by a cost/benefit analysis described in 24 C.F.R. § 965.404. *See* 24 C.F.R. § 965.403.

The PHAs were permitted to convert from mastermetering to either retail service or checkmetering, *see* 24 C.F.R. § 965.401, but the regulations stated no preference between the two systems of individual metering. As we noted previously, THA currently uses both systems, and assignment to units in one system or the other is completely random. In the district court, the Tenants argued that THA had not complied with the individual metering regulations. The district court concluded that the individual metering regulations did not apply to THA's proposed conversion because THA was converting from checkmetering to retail service, not from mastermetering to retail service. Thus, the district court concluded that "no showing has been made that THA is imposing conditions for eligibility inconsistent with the Housing Act of 1937." (R.1–29 at 6.)

The Tenants argue on appeal that while THA's proposed conversion may not violate the individual metering regulations, it nonetheless is inconsistent with the Act itself. In support of their position the Tenants cite *Fletcher v. Housing Auth. of Louisville,* 491 F.2d 793 (6th Cir.), *vacated,* 419 U.S. 812, 95 S.Ct. 27, 42 L.Ed.2d 39 (1974), *judgment reinstated on remand,* 525 F.2d 532 (6th Cir.1975). In *Fletcher,* the housing authority had instituted a rent range formula that gave preference to applicants who could pay higher rents. 491 F.2d at 796–97. The court found that the housing authority was imposing eligibility criteria not authorized by Congress in the Act, *id.* at 804–05, and invalidated the rent range formula. *Id.* at 807–08.

The Tenants also cite cases where various federal courts have struck down PHA policies: imposing a duration-of-family requirement, *James v. New York City Hous. Auth.,* 622 F.Supp. 1356 (S.D.N.Y.1985); discontinuing the provision of stoves to new tenants, *Curtis v. Housing Auth. of City of Oakland,* 746 F.Supp. 989 (N.D.Cal.1990); and imposing a two-year residency requirement, *Cole v. Housing Auth. of Newport,* 435 F.2d 807 (1st Cir.1970). The Tenants argue that the cost-effectiveness and uniformity desired by THA are not valid grounds for violating the purpose of the Act, no matter how small the additional financial burden on the Tenants.

While we might agree that cost-effectiveness and uniformity, standing alone, are insufficient to justify THA's actions, we do not believe that these are the only justifications supporting the conversion. In promulgating the individual metering regulations, HUD authorized the use of *both* checkmetering and retail service. HUD stated no preference for one method over the other, but left that choice for the PHAs. Since security deposits and arrearage provisions were common when the individual metering regulations were originally promulgated, this indicates that HUD did not consider such provisions inconsistent with the purposes of the Act. Moreover, forbidding a PHA to convert from checkmetering to retail service could impinge

on the Act's stated purpose of vesting in local PHAs "the maximum amount of responsibility in the administration of their housing programs." 42 U.S.C. § 1437.

We hold that the district court did not abuse its discretion in concluding that the Tenants had not demonstrated a substantial likelihood of success on their claim under the Act. In so holding, however, we emphasize that " '[n]o attention is paid to the merits of the controversy beyond that necessary to determine the presence or absence of an abuse of discretion.' " *Cafe 207*, 989 F.2d at 1137 (alteration in original) (quoting *Di Giorgio v. Causey*, 488 F.2d 527, 529 (5th Cir. 1973)).[2]

### B. *The Brooke Amendment*

The Brooke Amendment to the United States Housing Act of 1937, 42 U.S.C. § 1437a, provides that a tenant's rent may not exceed a fixed percentage of his or her income. As indicated in 42 U.S.C. § 1437f(c)(1) (Supp. IV 1992), Congress clearly intended rent to include an allowance for utilities. HUD regulations establish that the allowance is intended to "approximate a reasonable consumption of utilities by an energy-conservative household of modest circumstances consistent with the requirements of a safe, sanitary, and healthful living environment." 24 C.F.R. § 965.476(a) (1993). HUD's definition of rent therefore takes into account a utilities allowance:

> *Tenant Rent.* The amount payable monthly by the Family as rent to the PHA. Where all utilities (except telephone) and other essential housing services are supplied by the PHA, Tenant Rent equals Total Tenant Payment. Where some or all utilities (except telephone) and other essential housing services are not supplied by the PHA and the cost thereof is not included in the amount paid as rent, Tenant Rent equals Total Tenant Payment less the Utility Allowance.

24 C.F.R. § 913.102 (1993); *see also* 24 C.F.R. § 965.472 (1993) (defining "tenant rent" in virtually identical manner).

The Tenants argue that by converting from checkmetering to retail service, THA is effecting an increase in their rent in violation of the Brooke Amendment because they will be required to pay a security deposit to TECO, and in some cases an arrearage as well. This argument fails to recognize that rent is defined as the "amount payable monthly by the Family ... *to the PHA.*" 24 C.F.R. § 913.102 (emphasis added). Amounts paid under retail service are not paid to the PHA, but to the utilities; thus, they are not within the HUD definition of "rent." The HUD regulations recognize this fact when they speak of utilities "not supplied by the PHA" and state that "the cost thereof *is not included in the amount paid as rent.*" *Id.* (emphasis added).

Nearly twenty years ago, the Tenth Circuit noted that rent "is a compensation or income which the owner of land receives from a tenant for the use or occupation of the land." *Peterson v. Oklahoma City Hous. Auth.*, 545 F.2d 1270, 1274 (10th Cir.1976). The court noted, however, that a security deposit was not "compensation ... for the use ... of the land" but more in the nature of a trust fund. Thus, because a security deposit was not compensation for the use of land, a security deposit was not rent under the Brooke Amendment. *Id.* In a similar fashion, arrearages are not compensation for the use of land, and should not be considered rent under the Brooke Amendment.

In *Miles v. Metropolitan Dade County*, 916 F.2d 1528 (11th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 273, 116 L.Ed.2d 225 (1991), we refused to apply the *Peterson* rationale to court costs imposed by a PHA in eviction proceedings. *Id.* at 1533. However, while we held that a PHA could not impose or collect court costs on its own, we noted that such charges would be valid if imposed by a court after the PHA won in court. *Id.* at 1532. Thus, in that analogous situation, we acknowledged that charges imposed by entities *other than the PHA* were not rent under the Brooke Amendment.

---

2. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Because the security deposits and arrearage arrangements required by TECO are not paid to THA, are not within the HUD definition of rent, and are not compensation for the use of land, they are not considered rent under the Brooke Amendment. Thus, the district court correctly concluded that THA's proposed conversion from checkmetering to retail service does not violate the Brooke Amendment, 42 U.S.C. § 1437a.

### C. *Due Process*

■ The Tenants' complaint asserts that THA's proposed conversion to retail service would violate due process because it would result "in the delegation to the utility companies ... the authority to decide whether the Plaintiffs have continued occupancy ... by categorical acceptance of TECO's belief" that a tenant owes an arrearage or security deposit. (R.1–1 at 21.) This argument is based on the provision in all THA leases that requires tenants to maintain utility service as a condition of residency.

The district court noted that THA's standard dwelling leases "require that Plaintiffs be afforded notice and an opportunity to be heard (in the form of a grievance hearing) before their leases can be terminated." (R.1–29 at 6.) The Tenants argue that this eviction hearing would come too late, after TECO had decided to discontinue utility service, and would be virtually meaningless. *See Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970) ("[H]earing must be 'at a meaningful time and in a meaningful manner.'") (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)).

The Tenants ignore the fact that any tenant who contests an amount allegedly owed to TECO may utilize any grievance procedure TECO may have or may contact the state regulatory authority. Moreover, their attempt to convert TECO's policies into state action are unpersuasive. We also note, as did the district court, that THA's executive director filed an affidavit stating that THA "has agreed to advance all or part of any security deposit an affected resident cannot pay because of demonstrated hardship prior to the change, and allow such residents to

enter into a promissory note to repay THA." (R.1–29 at 3) (quoting Evans Aff., R.1–22 ¶ 11). The district court also quoted TECO's director of customer service as stating:

> In an attempt to make this transfer to retail service through [TECO] as easy as possible for the tenants of the THA housing developments, [TECO] has agreed to connect and begin electric service for those tenants who have paid their security deposits and who have contacted [TECO] and have committed to a long-term arrangement for the payment of any prior indebtedness that customer may have for previous electric service. **Payment in full is not expected prior to the connection of their electric service. Further, [TECO] is not requiring that any payments for this prior indebtedness actually be made before their electric service is connected.**

*Id.* (alterations in original) (quoting Fischer Aff., R.1–23 ¶ 6).

Although the Tenants dismiss these affidavits as self-serving, they indicate that THA does not plan to evict any resident without notice, an opportunity to be heard, and an opportunity to work through his or her financial difficulties. *See Johnson v. General Motors Corp.,* 598 F.2d 432, 436 (5th Cir.1979) ("Notice and an opportunity to be heard are 'fundamental requisites of the constitutional guarantee of procedural due process.'") (quoting *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 174, 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974)). On the abbreviated set of facts presented, we cannot say that the district court abused its discretion in concluding that the Tenants had not demonstrated a substantial likelihood of success on the merits of their procedural due process claim.

■ The Tenants also argue that THA's proposed conversion from checkmetering to retail service violates substantive due process, citing our statement that "'deprivation of a property interest for an improper motive and by means that [are] pretextual, arbitrary and capricious' constitutes a substantive due process violation." *Barnett v. Housing Auth. of City of Atlanta,* 707 F.2d 1571, 1577 (11th Cir.1983) (alteration in original) (quoting *Hearn v. City of Gainesville,* 688 F.2d

1328, 1332 (11th Cir.1982)), *overruled,* *McKinney v. Pate,* 20 F.3d 1550, 1560 (11th Cir.1994) (en banc). Here, however, THA demonstrated valid, rational bases for its desire to convert from checkmetering to retail service: cost-effectiveness and uniformity. We agree with the district court that it does not appear that THA has acted "arbitrarily, capriciously, or irrationally." (R.1–29 at 6.) This claim is meritless.

## IV. *Conclusion*

For the reasons stated above, we conclude that the district court did not abuse its discretion in denying the Tenants' Motion for Preliminary Injunction, and its order is AFFIRMED.